IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

| | | |
|---|---|---|
| RANDLE PORTER COOKE, | ) | |
| | ) | |
| Plaintiff | ) | No. 5:19 CV 490 |
| | ) | |
| vs. | ) | |
| | ) | COMPLAINT |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant | ) | |

The plaintiff, Randle Porter Cooke, by his counsel, complaining of the defendant, alleges and says that:

## JURISDICTION

1. This civil action is brought pursuant to the Federal Tort Claims Act of 1948 as amended, 28 U.S.C. 2671 et seq., and this Court has jurisdiction pursuant to 28 U.S.C. 1346(b).

## PARTIES

2. The plaintiff, Randle Porter Cooke, is domiciled in the State of Tennessee and has since approximately March 9, 2009 been incarcerated under civil commitment at the Federal Correctional Institute in Butner, North Carolina (FCI Butner).

3. FCI Butner is a facility operated by the Federal Bureau of Prisons, an agency of the United States Department of Justice, and thus an agency of the defendant, the United States of America.

## VENUE

4.  Venue is properly in the Eastern District of North Carolina, 28 U.S.C. 113(a).

1

5. Randle Cooke has been in the custody of the BOP since June 24, 2002. He has been a paraplegic, confined to a wheelchair and catheterized 24/7, due to a motorcycle accident, for 39 years.

6. On November 24, 2018, while seated in his wheelchair outside his room at FCI Butner, Randle Cooke felt a sudden significant tightness in his chest. Fearing he might be experiencing a heart attack, he had a friend wheel him to the medical station.

7. The nurses at the medical station evaluated him, did an EKG exam on him, and told him that all indications were that it likely was a heart attack.

8. Randle Cooke was then transferred to the Duke University Medical Center in Durham and was admitted. He was an inpatient at Duke for 5 days, November 24 – November 28, 2018.

9. On November 28, 2018 at approximately 1900 EST, BOP Officers Ragland and Ashmore came into Cooke's room at Duke to transport him back to FCI Butner.

10. Sunset in Durham that day was at 1702 EST, so it was dark when the BOP officers got Cooke in his wheelchair to the BOP van they had driven from Butner to Durham.

11. Officer Ragland shackled and handcuffed Cooke in his hospital room. Cooke advised Ragland several times that he is a high level paraplegic with significant balance issues, and that he needs to have at least one hand free to hold on to something in case he should lose his balance.

12. While being wheeled to the BOP van, Cooke also spoke with Officer Ashmore. He told Ashmore that in the past, whenever he was transported

2

somewhere, the BOP personnel in charge of transporting him would leave one or both of his hands free so he would be able to hold on to the seat or bench in the back of the van or to the window bars for balance as needed. That would prevent him being thrown from his wheelchair in the event of an accident of some sort. Ashmore's response was that Ragland was driving and in charge.

13. Officer Ragland tied down Cooke's wheelchair in the dark. Both BOP officers tried to use the flashlight feature on their cell phones to provide adequate lighting, to no avail. There were no functioning lights in the back of the van.

14. There was no seat belt in the back of the van where the plaintiff's wheelchair was to be secured. There was some sort of belt that reached from the ceiling on one side of the van and secured to the floor across on the other side of the van, but that belt did nothing to restrain the plaintiff in his wheelchair and this fact was pointed out to Officer Ragland before he locked the plaintiff alone in the back of the van. There was no seatbelt to secure Cooke into his wheelchair, and the officers knew that.

15. At one point as they were getting Cooke into the van, Ashmore remarked to Ragland, "You know, we have never been trained to do this."

16. As Officer Ragland was about to exit the back of the van, Cooke again asked about leaving at least one hand free in case of an accident. Ragland responded "I just came out of the warehouse, so I am doing it the way I am supposed to. Don't worry about it."

17. Cooke did however worry about it, as he had just heard Ashmore saying they had never been trained for this procedure.

3

18. Within 5 minutes of leaving the Duke parking lot, Ragland hit the van brakes hard at a red light. Cooke was thrown from his wheelchair onto the van floor. As he hit the van floor, he heard and felt his right leg break and began screaming.

19. It took Ragland a couple of minutes to pull the van over out of the traffic lane to the side of the road.

20. Ragland and Ashmore came to the back of the van, and Cooke showed them the unnatural way in which his right leg was bent, broken, and moving. They picked Cooke up and put him back in his wheelchair. He was suffering extreme pain and that just exacerbated it.

21. Ashmore and Cooke wanted to turn around and return to the Duke ER, as they were still in Durham.

22. Ragland though advised they would not be returning to Duke, but would instead be going to the Federal Medical Center (FMC) at Butner, the better part of an hour away. Ragland refused to call ahead for emergency personnel when Cooke showed him the fracture and the unnatural movement of the femur. While screaming in pain, the plaintiff told the officers about the dangers of a broken femur-how a small nick to the femoral artery could have him bleed out within a short time, but Ragland insisted Cooke's leg was not broken. He said "Maybe you just tore a ligament or something" as he threw Cooke back into his wheelchair. Fortunately, the plaintiff had a strap for the stabilization of his legs during spasms, and he was able to somewhat secure his leg for the long ride back to FMC Butner, all the time in extreme pain.

4

23. Ragland asked Ashmore to sit with him in the front of the van, but Ashmore said he would remain in the back of the van with Cooke to make sure he didn't fall again.

24. Several times during the remainder of the ride from Durham to FMC Butner, Ashmore had to grab Cooke and steady him to keep him from falling again. Had Ashmore not been in the back of the van with him, Cooke would have fallen again, at least once and perhaps more.

25. When the van arrived at FMC Butner, a hospitalist took one look at the fracture of Cooke's right femur, a severe severance of the femur just above his right knee, and ordered Ragland and Ashmore to return to Duke with Cooke immediately.

26. Back in the van they all went, with Ragland driving and Ashmore in the back assisting Cooke.

27. Upon arrival back at Duke, a nurse asked "Didn't you just leave us, Mr. Cooke?" Cooke was unloaded from the van and evaluated by Duke medical personnel. The decision was made to operate after stabilizing the fracture with traction.

28. That night, i.e. November 28-29, 2018 the surgery was done at Duke by Dr. Rachel Mary Reilly, Assistant Professor of Orthopedic Surgery and Interim Chief of the Orthopedic Trauma team at Duke.

29. Dr. Reilly repaired the femur fracture surgically and implanted a metal rod from Cooke's right knee to his right hip up to the femur center. Metal screws were inserted at each end of the rod to secure it. The rod and the screws will remain in Cooke's body for life.

5

30. On December 5, 2018 Cooke was discharged from Duke. Dr. Reilly advised him he would be scheduled for a post-op follow up appointment at Duke soon, i.e. within a week, and she also prescribed heavy duty pain medication for him, along with physical therapy. Her instructions were given to the BOP as well.

31. To date, October 2019, almost 11 months post-op, Randle Cooke has yet to have his follow up appointment with Dr. Reilly at Duke, though he has repeatedly inquired about it. He last saw Dr. Reilly on December 5, 2018 when she pronounced him ready for discharge.

32. The pain medication Dr. Reilly prescribed for Cooke was significantly reduced at FMC Butner, as to dosage and frequency. He has to date received almost none of it.

33. To date, in spite of repeated inquiry, Cooke has not had the physical therapy ordered by Dr. Reilly.

34. The pain Cooke experiences due to all the above remains intense and near constant. He cannot sit for very long without significantly increased pain.

35. Randle Cooke is not serving a criminal sentence at FCI Butner, but is a civil detainee under 18 U.S.C. 4248, United States v. Cooke, No. 5:09 HC 2034 (EDNC). Officer Ragland has on numerous occasions evidenced disdain and arrogance toward the civil detainees, all of whom are in the Maryland unit at FCI Butner. That attitude of his was on full display on November 28, 2018 in the matter set forth above in this complaint.

36. Over the weekend of December 15-16, 2018 one of Ragland's fellow BOP staffers, known to be a friend of Ragland's, said to Randle Cooke, "I heard

6

how you threw yourself out of the chair and broke your own leg in the back of the van."

37. The helpful and supportive attitude of Office Ashmore was in marked contrast to that of Ragland.

38. The BOP is responsible for the safe transportation of all its guests, civil and criminal alike, to and from outside hospital facilities.

39. As BOP employees, and authorized agents, Ragland and Ashmore failed abysmally in carrying out that responsibility to Randle Cooke on November 29, 2019, as set forth above.

40. Ashmore even admitted that he and Ragland had no training at all for their assigned task of safely transporting a paraplegic to and from Duke. Nor apparently did they have any understanding at all of just how brittle paraplegics' bones are.

41. Ragland and Ashmore were actionably negligent in their failure to adequately secure Randle Cooke from falling on November 28, 2018.

42. At all times on November 28, 2018 Ragland and Ashmore were acting with the full authorization of their employer, the BOP.

43. Their negligence, described above, is imputed to the BOP and to the defendant Government through the agency doctrine of respondeat superior.

44. As the direct and proximate cause of the negligence referenced above on November 28, 2018, Randle Cooke suffered the following permanent injury:

Severe severance fracture of his right femur, just above the knee.

Pain and suffering in the BOP van when his femur was broken, continuing to the present, pain the BOP is not properly addressing, even

7

though the plaintiff has continually gone to sick call regarding pain issues.

Continued pain and suffering, constant and intense, which he is told will last for the rest of his life.

The implantation of the rod and pins, and without the proper physical therapy ordered by the Duke surgeon, the plaintiff will no longer be able to own/drive a lower cost vehicle such as a car equipped with simple hand controls.  Now he will be required to purchase an expensive lift-equipped van, as his right leg will no longer move and flex in a manner that will enable him to transfer and then swing his leg under the steering wheel and hand control apparatus.

This is but an example of one simple and common expense that the plaintiff will incur due to the defendant's negligence. He cannot even lie in bed on his back or stomach now due to the implantations of the rod, and due to the pain. Cooke can only lie on his left side all night long.

This will essentially leave him with significant skin break downs (bed sores), all because of this additional and major physical issue the plaintiff must endure as a disabled person.

The need to undergo orthopedic surgery at Duke, with the pain and suffering associated with that.

EXHAUSTION OF ADMINISTRATIVE REMEDIES

47. A Claim for Damages, Injury, or Death, dated January 18, 2019, pursuant to the Federal Tort Claims Act, was submitted to the BOP and received by the Assistant Director and General Counsel in Washington on February 11, 2019.  There has been no response to the claim, nor to a

8

September 10, 2019 letter from counsel inquiring if there would be a response, until late September 2019, when the BOP advised it would respond to the claim within 6 months, i.e. by March 2020.

48. Under 28 U.S.C. 2675(a), the claimant may now deem his claim denied and proceed with this complaint. We are now exercising that right.

49. All administrative remedies in connection with this claim have been exhausted pursuant to 28 U.S.C. 2872.

9

<u>CONCLUSION</u>

50. By reason of the negligence and the injury referenced above, the defendant United States of America is justly indebted to the plaintiff, Randle Cooke, in the principal sum of $1 million.

WHEREFORE the plaintiff, Randle P. Cooke, respectfully prays the Court:

A. For judgment against the defendant United States of America in the principal sum of $1 million with interest as allowed by law.

B. For reasonable counsel fees as allowed by law pursuant to 28 U.S.C. 2678, of 25% of the judgment amount.

C. For the costs of this action and for such other and further relief as the Court may deem just and equitable.

Respectfully submitted,

/s/ Bruce W. Berger
Bruce W. Berger
Attorney for the Plaintiff
Knott & Boyle
4800 Six Forks Road-Suite 100
Raleigh, NC 27609
bwb@brucebergerlaw.com
(919)783-4779
Fax (919)783-9650
NCSB 14470

/s/ James B. Craven III
James B. Craven III
Attorney for the Plaintiff
P.O. Box 1366
Durham, NC 27702
JBC64@MINDSPRING.COM
(919)688-8295
Fax (919)688-7832
NCSB 997

10